671 P.2d 923

Robert V. TUZON, Petitioner-Appellant,

v.

Ellis C. MacDOUGALL, ADOC Director, Robert L. Araza, Chairman, Arizona Board of Pardon and Parole Members, State of Arizona, Bruce Babbitt, Arizona Governor, Robert Corbin, Arizona Attorney General, Defendants-Appellees.

No. 1 CA-HC 60.

Court of Appeals of Arizona, Division 1, Department A.

Aug. 9, 1983.

Rehearing Denied Sept. 16, 1983.

Review Denied Nov. 1, 1983.

483

Robert V. Tuzon, in pro. per.

Robert K. Corbin, Atty. Gen., by Jay R. Adkins, Asst. Atty. Gen., Phoenix, for defendants-appellees.

## OPINION

KLEINSCHMIDT, Presiding Judge.

This is an appeal from the order of the superior court denying the petitioner's request for the issuance of a writ of habeas corpus to free him from the custody of the Arizona Department of Corrections. The petitioner, Robert V. Tuzon, contends that he was promised that the sentence he was serving would be commuted to immediate release with life parole in return for his cooperation and testimony in connection with cases arising out of the notorious Tison prison escape. It is conceded that if a binding agreement existed Tuzon has fulfilled his part of it. The question is whether he ever had an agreement with anyone authorized to promise his release.

The trial court afforded the petitioner a full and fair hearing that consumed the better part of eleven trial days. A review of the transcript of the hearing shows that Tuzon had every opportunity to develop and

present his case. It is well that this is so because the petitioner challenges the integrity of high state officers and the system that they represent.

We affirm the judgment of the trial court. The record shows without dispute that the petitioner did not have an agreement with any person or persons who were authorized by law to effect his release.

■ Under the terms of A.R.S. § 31–402, the Arizona Board of Pardons and Paroles has exclusive power to pass upon and recommend commutations of sentence and no commutation can be granted by the governor unless it has first been recommended by the board. There is nothing in the statutory scheme which would empower one member of the board to speak or act for another or for the board as a whole.

The pertinent facts are these. The petitioner was, in 1979, serving a sentence of twenty years to life for second degree murder. In early July of 1978, he initiated contact with Ellis MacDougall, the then director of the department of corrections, and advised him in general terms of an impending escape. Tuzon wanted to make a deal to dismiss an escape charge that was pending against him and for release from his sentence so he did not tell MacDougall everything he knew about the escape plan. Instead, he requested MacDougall to contact William Friedl, his then attorney, so that some kind of agreement could be worked out.

On July 30, 1978, Gary Tison and Randy Greenawalt did escape and run amok. Before they were recaptured they killed six people. The authorities desperately sought their apprehension and throughout the period while the Tison gang was free the petitioner cooperated with the prosecutor and police. He provided a lead which may well have been responsible for their recapture in early August, 1978.

In September, 1978, petitioner was transferred to the California Men's Colony for his own protection. During the time petitioner was in California, an Arizona law enforcement officer named Brawley, Michael Donovan, Deputy Maricopa County Attorney, and Friedl visited petitioner and arranged for his testimony and the testimony of petitioner's wife in the upcoming Tison trial. The terms of that agreement were memorialized by Friedl in a note he made as follows:

6–18 interview—present Tuzon, Friedl, Donovan, Tom Brawley.—transactional immunity for Bob and Irma conveyed by Donovan simply for giving statement which was given.

Additionally—if Bob gave statement today any deal would be negotiated later. Bob would not be called to testify, nor Irma, until deal negotiated. If Bob didn't like deal or no deal, Bob will not be called as a witness, nor would he be penalized.

Several exchanges give rise to Tuzon's claim that he was promised his release. At some time before he testified in the Tison matter he was informed through his attorney that if he gave testimony in the Tison trials that the parole board would recommend a commutation that would work his immediate release. This was based upon a promise that Friedl testified was made by Robert Araza, the then chairman of the board of pardons and paroles. Friedl's affidavit was attached to the petition for a writ of habeas corpus. It reads:

That I was specifically informed by ROBERT ARAZA that should ROBERT VINCENT TUZON testify for and on behalf of the State of Arizona in all matters requested against those persons involved in the prison escape involving GARY TIZON and in all subsequent and ancillary criminal matters arising therefrom, that upon notification by the Maricopa County Attorney's Office of completion of the same, and upon recommendation of the Maricopa County Attorney's Office, ROBERT ARAZA assured a commutation and release from prison for Petitioner.

When he testified at the hearing Friedl explained this alleged promise in greater detail. He said that he knew that to secure Tuzon's release he would have to get the concurrence of the parole board. He be-

lieved that if Tuzon received a recommendation from the board that the governor would follow it. At some time during the summer of 1979, Donovan and Friedl met with Araza. They discussed the past votes of the board members on prior Tuzon applications for commutation and Araza told Friedl that Araza and two other board members had voted against Tuzon's application. The record does not clearly show whether or not Friedl knew that the prior votes were on motions to recommend a commutation to a sentence of ten years to life, a sentence that could not have resulted in immediate release or parole. Araza, according to Friedl, guaranteed that he would change his vote and persuade the two others to vote for a commutation that would work an immediate release.

■ Araza directly contradicts this evidence. The trial judge's order makes no specific finding that Friedl is correct on this issue and Araza incorrect or vice versa. Instead, he found that if Araza made the promise he had no authority to speak for the other members of the board and that no enforceable agreement arose thereby. We agree.

Tuzon testified, however, that Ellis MacDougall made certain promises to him and to Tuzon's wife. Mrs. Irma Tuzon had information regarding the Tison escapes and she also cooperated with the authorities in an attempt to secure her husband's freedom. Shortly after Tuzon told MacDougall of the impending escape, MacDougall remarked that if the information Tuzon was giving were true he, Tuzon, was a "shoo-in for release." Further, according to Tuzon, shortly after the escape took place MacDougall told him that he had spoken with Friedl and the governor and that he was authorized to promise Tuzon his release if he helped capture the Tisons and Greenawalt. MacDougall allegedly said that he was an extension of the governor's office and that since the governor appoints the members of the board of pardons and paroles he could control the board's actions. Still another promise of freedom was supposedly made

by MacDougall at the Maricopa County Jail in September, 1978.

There was other testimony by Tuzon and his wife regarding comments made either to Tuzon or other members of his family by MacDougall or other employees of the department of corrections that, while too vague to be categorized as promises, can be construed as corroborating the assertion that a promise of release had been made.

Ellis MacDougall contradicted the assertion that he had ever promised Tuzon's release or represented that he had authority from the governor to make such a promise. MacDougall's position is strongly, if partially, corroborated by the evidence that when Donovan, Friedl, Brawley and Tuzon met at the California Men's Colony in June, 1979, it was specifically agreed that the Tuzons would not have to testify in the Tison matter *until a deal had been negotiated.* Since many of MacDougall's alleged promises occurred before the California meeting, it is obvious, if Friedl's memo is correct, that no agreement had been worked out before that time.

Governor Bruce Babbitt also testified at the hearing. He stated that he did not delegate any authority to anyone in connection with the Tison matter but simply brought together various law enforcement agencies acting under the jurisdiction bestowed on them by law to coordinate the Tison manhunt. He testified that he did not authorize anyone to make any promises on his behalf and that he did not promise Tuzon anything through MacDougall.

The trial court found no compelling evidence of such a delegation of authority and noted that even if there had been such a delegation MacDougall and the governor had no authority to bind the board of pardons and paroles. The trial judge stated that he believed, in effect, that Tuzon indulges in wishful thinking. It is clear from the trial judge's order that he found that the promises described by Tuzon were not made.

It was undisputed that MacDougall, Donovan and Lawrence Turoff, the prosecutor who took over from Donovan after Donovan was appointed to head the Tison Task

Force, all promised that if Tuzon cooperated they would urge the board to commute his sentence so that he could achieve an immediate release. Tuzon acknowledged that he knew that these people alone did not have the authority to release him. It is undisputed that all of these men made a good faith effort to persuade the board to commute petitioner's sentence to effect an immediate release. Each fulfilled his promise.

■ While the petitioner has not specifically raised the issue of contract by estoppel we have searched the record with an eye to determining whether the members of the board (other than Araza) and the governor might have been aware, before and while Tuzon was testifying on the Tison matters, that he was doing so upon the belief that he had in fact been promised his immediate release. Nothing in the record will support such a conclusion.

## RIGHT TO COUNSEL AND RIGHT TO ADVISORY COUNSEL

The petitioner also contends that the trial court erred in failing to appoint counsel to represent him, and in failing to allow advisory counsel to be present with him during the evidentiary hearing on his petition for a writ of habeas corpus. The petitioner never requested the appointment of counsel. During the first day of the evidentiary hearing, he did move that Friedl be allowed to sit at his table "because he was a party, also, to this case, and give me some advice, if I need it, possibly." The trial court denied the request noting that there was a difference between a witness and a party. Friedl, of course, was a witness in the proceedings.

■ Traditionally, a petitioner in habeas corpus proceedings is not entitled to appointed counsel. This is so because such proceedings are considered civil rather than criminal in nature. *Powell v. State,* 19 Ariz.App. 377, 507 P.2d 989 (1973); *State v. Bost,* 2 Ariz.App. 431, 409 P.2d 590 (1966); *Leonard v. Eyman,* 1 Ariz.App. 593, 405 P.2d 903 (1965); *Collins v. Heinze,* 217 F.2d 62 (9th Cir.1954), *cert. den.* 349 U.S. 940, 75

S.Ct. 786, 99 L.Ed. 1268 (1954). There is nothing in A.R.S. § 13–4021, *et seq.,* dealing with writs of habeas corpus that would expressly authorize the appointment of counsel. We note that the supreme court has held that appointment of counsel in proceedings for post-conviction relief brought pursuant to Rule 32, Ariz.R. Crim.P., is mandatory upon a proper request from the defendant and a finding that the defendant is indigent. *Galaz v. Carruth,* 129 Ariz. 368, 631 P.2d 523 (1981). Rule 32.5(b) itself provides for the appointment of counsel in such proceedings. Since petitions for post-conviction relief under Rule 32 encompass many of the grounds for relief formerly available under habeas corpus procedures they are designed to challenge the validity of a conviction or sentence and are deemed criminal in nature. Since the object of either proceeding is to secure the liberty of one who is incarcerated, the distinction between petitions for post-conviction relief and petitions for a writ of habeas corpus may frequently seem artificial. Such is certainly less true in a case like this one where the entire issue turns upon the application of the civil law of contract. We hold that the trial court did not err in failing to *sua sponte* appoint counsel to represent petitioner.

■ We further hold that the trial court did not err in refusing to grant petitioner's request to allow Friedl to sit with him. Friedl was not a party to the action and was a witness. Therefore, pursuant to Rule 615, Ariz.R.Evid., Friedl was properly excluded from the proceedings. Nor do we think that petitioner's somewhat misdirected and rather offhand request was sufficient to bring home to the court the fact that Tuzon seriously wanted counsel.

## OTHER ISSUES

Petitioner raises numerous other issues. Some concern matters either not contained in the record or not properly reserved for purposes of appeal. We shall discuss all of them.

■ Tuzon argues that the trial court erred in precluding his review of his prison record, and he contends that A.R.S. § 31–221(C), (D), providing for the confidentiality of the record, is unconstitutional. Although the constitutionality of the statute, and its juvenile counterpart, A.R.S. § 8–207, have been addressed in *State v. Morales*, 129 Ariz. 283, 630 P.2d 1015 (1981), and *Ortega v. Holmes*, 118 Ariz. 455, 577 P.2d 741 (App. 1978), the record in this case does not reveal that petitioner ever requested access to his prison record. In the absence of an appropriate and timely request to the trial court, we find that the petitioner has waived this claim of error on appeal.

■ Petitioner also argues that the trial court erred in not holding a hearing to reproduce tapes of his commutation hearing held on December 3, 1981, before the board of pardons and paroles. The board did tape the commutation hearing on December 3, 1981. This procedure was unusual in that the hearings are rarely, if ever, tape recorded. At the time of the evidentiary hearing on the petition for the writ of habeas corpus, it became clear that the tapes of a portion of the hearing had been lost. Other portions of the hearing were transcribed. It is further clear that there is no requirement either by statute, rule or regulation that the hearings be taped. Petitioner contends that the trial court erred in not holding a hearing to reconstruct the tapes. The record does not reveal that petitioner requested that the trial court hold such a hearing to reconstruct the record of the commutation hearing, and in the absence of such a request petitioner is deemed to have waived the issue on appeal. Even if no waiver has occurred we do not see the matter as a legitimate issue. While the petitioner's point is somewhat vague he apparently wants the tape or the reconstruction of the hearing to prove that during the hearing, when Friedl accused Araza of promising freedom for Tuzon, that Arter Johnson, the chairman of the board, intervened and instructed Araza not to discuss that issue. The state has never denied that such an incident occurred at the meeting in question. Since there is no dispute as to what happened at the hearing, we do not consider the missing tape important.

■ Tuzon also claims that the trial court permitted MacDougall and Araza to commit perjury during the hearing on his petition and that the trial court should have referred the matter of perjury to the proper prosecutorial authorities. His brief in this regard is a catalogue of disputed testimony and instances of internal inconsistencies, real and imagined, in the state's case. What petitioner overlooks is that the trial court inferentially rejected parts of petitioner's evidence, disagreed with the interpretation that petitioner would give to much of it, and specifically considered the most glaring conflict between Friedl's version of the negotiations and Araza's to be immaterial. Our own review of the record does not reveal anything that would mandate a referral of the matter to any authority for possible prosecution for perjury.

■ The petitioner also claims that it was error to allow the prosecutor to file what he describes as falsified evidence. While his brief is imprecise on this point he is apparently referring to the evidentiary problem that arose out of his own efforts to admit Exhibit 42 into evidence. Exhibit 42 was a certified exemplified copy of a Motion to Dismiss filed by the state in the case of *Tuzon v. Zorn*, No. CIV 82–556 PHX–CLH, in the United States District Court for the District of Arizona. Attached as an exhibit to that motion was a copy of an office memo from Zorn, the warden of the Arizona State Prison, to Tuzon dated January 14, 1982. The subject of the memo is an inquiry as to whether Tuzon will acquiesce in certain administrative procedures. Previously, the state had admitted in evidence a similar document designated as Exhibit 34. The whole thrust of these documents is somewhat obscure but they were offered to refute Tuzon's claim that MacDougall had sought to coerce Tuzon into waiving the promise MacDougall had made for his release by the use of internal prison procedures. In any event, Tuzon admitted that Exhibit 34 was genuine. He

contended that Exhibit 42, which had been filed in the district court, was an altered copy of Exhibit 34. He sought the admission of Exhibit 42 to impeach the state. The court reserved its ruling on the basis that Tuzon had failed to show who altered the document and ultimately Exhibit 42 was never admitted. There was no error in this ruling by the trial court. There is no claim that the document admitted in *this* case was false. The proffered impeachment, at its very best, was offered on a collateral matter. *See State v. Acree,* 121 Ariz. 94, 588 P.2d 836 (1978).

▇ Tuzon next argues that police investigator Thomas McAfee's working papers should have been admitted in evidence. During the testimony of Detective McAfee the petitioner asked him if he had notes or information that came to him during the course of his investigation. He said that he did and Exhibit 38, a report from Harold Cardwell to the director of the department of corrections and to the governor, was marked for identification. The petitioner offered it to show that MacDougall, contrary to what he had testified to, had prior knowledge that the Tison escape was imminent. The trial court sustained an objection to its admission on the grounds that it was hearsay. The ruling was correct but even if it was not, the exclusion of Exhibit 38 is not grounds for reversal. The report assumes that MacDougall knew the names of those plotting the escape based on what Tuzon told Cardwell after the escape. In this respect it adds nothing that was not already in evidence. However, even if it did it would have been impeachment on a collateral point. Furthermore, even if that were not correct we point out again that assuming the petitioner's version of everything MacDougall promised him were correct he would not be entitled to release because MacDougall had no authority, even with the governor's consent, to release him.

The petitioner argues that certain newspaper articles should have been admitted in evidence. Some newspaper articles were marked as Exhibit 18. That exhibit was withdrawn from evidence and is therefore not included in the record. However, the record does show that the trial court permitted the petitioner to have Friedl read them to refresh his recollection while he was testifying about information Tuzon had given that somehow leaked to the press.

▇ At one point during the questioning of MacDougall the petitioner asked whether a polygraph examination had been arranged for him at a particular time. When MacDougall answered no, the petitioner tried to refer, without marking it as an exhibit, to a particular newspaper article. Following an objection the petitioner explained in essence that he wanted to refresh the witness's recollection. The court explained that newspaper articles were hearsay and that they could not be used for purposes of impeachment. At this point the petitioner withdrew the question he had been in the process of posing. This was not error.

Finally, with respect to questions of evidence, Tuzon argues that a statement given by Harold Cardwell, the former warden of the state prison, should have been admitted in evidence. From all we can tell from a complete review of the record he is referring to Exhibit 38. We have dealt with that issue above.

Next petitioner claims that the prosecutor, Jay Adkins, xeroxed a deposition and billed petitioner for the xerox costs. There is no record on this matter and we cannot consider it. Nor do we see how such claim relates to the issues presented in the matter before us.

▇ Petitioner contends that the trial court erred in not ordering that he be granted a new hearing. He supports his argument by a general reference to the principles of due process. As we have said, the petitioner received a full and very fair hearing. There is no merit in his argument.

▇ The petitioner asserts that the trial court erred in denying an order for a new hearing before the parole board because certain disciplinary write-ups were improperly a part of his file at the time of the commutation hearing. The petitioner is entirely correct in saying that those write-ups

should not have been in his file. They were apparently groundless and the state concedes as much. The trial judge expressed concern about this in that portion of his written order in which he urged the authorities to confer the relief that he was powerless under the facts and the law to grant. What the record does show is that each member of the board was questioned on this point and testified that the write-ups did not influence his or her decision. Two members testified that they considered the incidents satisfactorily explained by the petitioner. We do not believe the petitioner has demonstrated that his hearing before the board was flawed for this reason.

█ The petitioner contends that since he was proceeding *in forma pauperis* his wife should be refunded the filing fee that she paid on his behalf. Tuzon filed an affidavit of indigency along with his petition for a writ of habeas corpus. Apparently the clerk of the superior court would not accept his petition without payment of the filing fee and Mrs. Tuzon paid it. From what appears in the record before us the court made no determination of indigency at that time.

After the hearing the petitioner filed a motion to refund the fee. On September 29, 1982, the trial court ruled that defendant's notice of appeal be deemed filed on August 23, 1982. It further ordered that the county attorney be permitted until October 14, 1982, to respond to the motion for a refund of fees. There is nothing in the record as to any subsequent action on this motion. We are, however, aware of the provisions of A.R.S. § 13–4143 which states that "no fee or compensation of any kind shall be charged or received by any officer for duties performed or services rendered in habeas corpus proceedings." The provision originally derives from Rev.Stat.1901 § 2650 where it was a part of the title dealing with fees and salaries of county officers, including the clerk of the court. The statute which requires the payment of filing fees, A.R.S. § 12–311, refers to exceptions provided by law. This is one of

them. *Compare Tahtinen v. Superior Court,* 130 Ariz. 513, 637 P.2d 723 (1981).

IT IS ORDERED affirming the judgment of the trial court.

IT IS FURTHER ORDERED remanding this cause to the superior court with directions to order the clerk thereof to refund any filing fee paid in this case.

CONTRERAS, J., and YALE McFATE, Judge, concur.

NOTE: The Honorable YALE McFATE, a retired judge of a court of record, was authorized to participate by the Chief Justice of the Arizona Supreme Court pursuant to Arizona Const. Art. VI, § 20.